IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROBERT S. EVANS,** | : | |
| **Administrator of the Estate** | : | |
| **of Damon Sheron Rush,** | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 15-1839 |
| **UNITED STATES OF AMERICA,** | : | |
| **et al.,** | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

**Tucker, J.**                                                                 November _____, 2017

Presently before the Court is Defendant United States of America's Motion in Limine to Restrict Testimony of Drs. Freese, Hellman, Manion, and Ingram (ECF No. 78). Upon consideration of Defendant's Motion, Plaintiff's response thereto (ECF No. 90) and Defendant's Reply (ECF No. 92), Defendant's Motion is GRANTED IN PART AND DENIED IN PART.

### I.     FACTUAL AND PROCEDURAL BACKGROUND

On April 17, 2013, Damon Sheron Rush ("Decedent") fell through a water meter vault at the United States Marine Corp Training Center, where he was working as a landscaper. Over the course of the next two years, Andrew Freese, M.D., and William T. Ingram, D.O., treated Decedent for injuries he sustained as a result of the 2013 accident. These included injuries to his leg, knee, neck, and back. Five days after his accident, Decedent visited Dr. Ingram's office where he was seen by Dennis Winkelman, M.D., an associate of Dr. Ingram. During his visit, Decedent explained that he was performing duties as a landscaper at the Marine Training Center

when he stepped on a metal plate which tipped over, causing him to fall into the hole that had been covered by the plate.

In March 2015, Decedent sought additional treatment with Dr. Freese who recommended that Decedent undergo surgery to address Decedent's chronic pain caused by the accident. On June 2, 2015, Decedent underwent his first surgery, which was a multilevel cervical laminectomy. (Freese Report 3, ECF No. 78-4.) Following this surgery, Decedent suffered an infection in his surgical wounds, which required Decedent to undergo an additional surgery on June 26, 2015. (Freese Report 6.) Three different medical providers prescribed Decedent pain medications in order to help Decedent cope with the pain stemming from his accident and subsequent surgeries. On July 7, 2015, Decedent was found dead in his bed.

On April 9, 2015, Plaintiff, administrator of Decedent's estate, filed suit against Defendant asserting that Defendant was negligent in maintaining its property and allowing the metal cover to remain in a dangerous condition. On July 9, 2015, Fredric N. Hellman, M.D., performed an autopsy which revealed that the main cause of Decedent's death was "[m]ixed prescription drug intoxication." (Postmortem Report 1, ECF No. 78-5.) The Postmortem Report, prepared by Dr. Hellman also indicated a "recent history of cervical laminectomies, with complication thereof" was a significant condition contributing to Decedent's death. (Postmortem Report 1, ECF No. 78-5.) On November 24, 2015, Plaintiff amended his original complaint to include a survival action. (First Am. Compl. ECF No. 20.)

Defendant's instant motion seeks to exclude portions of testimony offered by Plaintiff's expert witnesses. Plaintiff's medical experts, Drs. Freese, Hellman, and Ingram, have each concluded that Decedent's death was caused by the accident which Decedent suffered on Defendant's property on April 17, 2013. These experts have concluded that Decedent died from

excessive ingestion of prescription medication, which Decedent was taking to cope with pain from the 2013 accident and subsequent surgeries. Plaintiff has also hired William L. Manion, M.D., to offer his expert opinion regarding the cause of Decedent's death. Dr. Manion agrees that Decedent's death was caused by the 2013 accident. Defendant argues that each of Plaintiff's experts' opinions of causation should be excluded because they lack sufficient basis for their opinions linking Decedent's death to the April 2013 accident.

## II.    STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has explained that Rule 702 has three major requirements. The proffered witness must: (1) "be an expert, i.e. must be qualified"; (2) "testify about matters requiring scientific, technical[,] or specialized knowledge"; and (3) present testimony that "assist[s] the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008). In sum, Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). "The party offering the expert must prove each of these requirements by a preponderance of the evidence."

*Mahmood v. Narciso*, 549 F. App'x 99, 102 (3d Cir. 2013) (citing *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999)).

Rule 702 has "a liberal policy of admissibility." *Pineda*, 520 F.3d at 243 (quoting *Kannankeril v. Terminix Inter., Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). Exclusion of expert testimony is the exception rather than the rule because "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Fed. R. Evid. 702 advisory committee's note to 2000 amendment (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993)).

### III. DISCUSSION

#### 1. Dr. Freese's Causation Opinion will not be Excluded.

First, Defendant argues that Dr. Freese's opinion should be excluded because his deposition testimony demonstrates that he lacks a sufficient basis for his causation opinion. While Dr. Freese agrees that Decedent died from mixed prescription drug intoxication, Dr. Freese admits that he was not aware that Decedent was taking a variety of prescription medications and that he did not know where Decedent obtained the medication. (Freese Dep. 62:20–21.) Based on these admissions, Defendant concludes that Dr. Freese has "no plausible basis for attributing Rush's death to drugs necessitated by Rush's accident or complications therefrom." (Def.'s Mot. to Restrict Test. 12, ECF No. 78.)

The Court finds that Dr. Freese causation opinion is reliable and will assist the trier of fact. Under Rule 702, an expert's opinion is admissible if the expert is qualified,[1] the opinion is

---

[1] "Qualification refers to the requirement that the witness possess specialized expertise." *Scheider*, 350 F.3d at 404. "A broad range of knowledge, skills, and training qualify an expert."

4

reliable, and it will assist the trier of fact. *Pineda*, 520 F.3d at 244. To be reliable, an expert's opinion must be based on the methods and procedures of science. *Scheider*, 350 F.3d at 404. In other words, the expert must have good grounds for his or her conclusions. *Id.* Dr. Freese began his treatment of Decedent on March 25, 2015, nearly two years after Decedent's 2013 accident. (Freese Report 1.) In reciting his medical history, Decedent informed Dr. Freese that, prior to the 2013 accident, Decedent had not experienced any neck or lower back symptoms, and had never sought medical treatment for such symptoms. (Freese Report 1.) However, after the accident, among other injuries, Decedent suffered from "progressive neck pain with headaches, and pain traveling into the left more than the right scapular and shoulder region and down his arm associated with some subjective numbness and tingling as well as weakness." (Freese Report 1.) Based on this information and Dr. Freese's observations during Decedent's physical examination, Dr. Freese concluded that Decedent's neck and spinal injuries were caused by the 2013 accident. The record before the Court offers no alternative explanation of Decedent's injury. (Freese Report 2.)

Dr. Freese noted that Decedent was taking a variety of prescription medication to treat the "significant neck and arm pain" he experienced after the 2013 accident. These medications included Vicodin (hydrocodone), Norvasc, hydralazine, metroprolol, clonidine, and Aleve. (Freese Report 2.) As part of Decedent's treatment for his neck and spinal injuries, Decedent underwent two surgeries. Decedent also relied on prescription medication to cope with pain following these surgeries. (Freese Report 5.) Based on these facts, Dr. Freese concluded that "if [Decedent] had not had the injury to his neck, it is clear that he would not have required the surgery, would not have had the complication of an infection, and would not have been taking

---

*Id.* (citations omitted). The Court neglects to include an analysis of the qualification of Plaintiff's experts because qualification is not in dispute.

5

the variety of medications. Thus, there is a lineage of cause and effect that related to the initial injury of April 17, 2013. . . ." (Freese Report 7.)

Dr. Freese's methodology is consistent with the "differential diagnosis" methodology, which the Third Circuit has found to be a reliable method for determining cause of death. *Heller v. Shaw Indus.*, Inc., 167 F.3d 146, 156 (3d Cir. 1999); *Terry v. McNEIL-PPC, Inc. (In re Tylenol (Acetaminophen) Mktg., Sales Practices, & Prods. Liab. Litig.)*, 2016 U.S. Dist. LEXIS 98862 at *9, (E.D. Pa. July, 27, 2016). The differential diagnosis methodology may consist of performing physical examinations, taking medical histories, and reviewing the patient's clinical tests. *Kannankeril v. Terminix Int'l*, 128 F.3d 802, 807, (3d Cir. 1997); *Heller*, 167 F.3d at 156. Here, Dr. Freese's opinion is based on his personal observations and knowledge of Decedent during several physical examinations, his review of Decedent's medical and social history, and his review of Decedent's autopsy report. Thus, the Court finds that there is sufficient basis for Dr. Freese's opinion. *United States. v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (citations omitted) ("As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross—examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.").

Differential diagnosis typically requires an expert to explain why his conclusion remains reliable in the face of alternate causes. *In re: Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 796 (3d Cir. 2017). However, in this case, the record does not contain alternate causes. The Parties agree that Decedent died due to mixed prescription drug intoxication. While Defendant suggests that Decedent was taking the mixture of medications as part of his "drug seeking behavior," the record does not support this suggestion. (Def.'s Mot.

6

Restrict Test. 3.) To the contrary, Decedent's social history revealed that he did not drink alcohol and did not use recreational drugs. (Freese Report 1.). Further, the Third Circuit has explained that, in certain circumstances, a doctor's determination as to causation may be admissible where the doctor has not examined alternatives.

> [I]magine a patient who comes in with medical records that include x-rays showing a fractured arm and who tells the doctor that he hurt the arm in a biking accident; the doctor could reliably conclude that the patient had a fractured arm caused by a biking accident even without physically examining the patient or taking a medical history. The biking accident is so much more likely to have been the cause of the fracture than anything else that there is no need to examine alternatives.

*In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 759–60 (3d Cir. 1994) (footnote and citation omitted). The present case is akin to the example provided by the Third Circuit in that Dr. Freese reviewed Decedent's MRI results and observed that there was "evidence of significant disk abnormalities." (Freese Report 3.) In addition to reviewing Decedent's MRI results, Dr. Freese performed a physical examination, which demonstrated that Decedent had "difficulty with extension in the lumbar spine." (Freese Report 2.) Decedent explained to Dr. Freese that he sustained injuries to his neck and back during the 2013 accident. Dr. Freese also learned of the several medications Decedent was taking to cope with the pain associated with these injuries. After Decedents death, Dr. Freese reviewed the Postmortem Report which indicated that the cause of death was mixed prescription drug intoxication. Because Decedent's social history and medical record is devoid of alternative explanations, it is more likely that Decedent was taking pain medication for injuries sustained from the 2013 accident. Therefore, there was no need to examine alternatives. *See In re Paoli*, 35 F.3d at 759–60.

Rule 702 also requires that the expert's testimony be relevant for the purposes of the case and must assist the trier of fact. *Scheider*, 350 F.3d at 404. The Court finds Dr. Freese's

7

testimony is relevant to the issue of proximate cause in this case. As such, Dr. Freese's testimony will help the trier of fact in determining whether there is a causal link between the 2013 accident on Defendant's property and Decedent's death.

**2. Dr. Hellman's Causation Opinion will be Excluded in Part.**

Next, Defendant asks the Court to exclude the testimony of Dr. Hellman. Dr. Hellman has not been retained as an expert for Plaintiff, but is the medical examiner that performed Decedent's autopsy. Defendant has no objection to Dr. Hellman testifying regarding his observations during the course of the autopsy, or explaining his decision making process in concluding that Decedent died of mixed prescription drug intoxication. However, Defendant takes issue with Dr. Hellman's opinion that Decedent's death was related to the 2013 accident. Defendant argues that this opinion is not within the scope of Dr. Hellman's report, has no reliable basis, and is not the product of any reliable methodology. (Def.'s Mot. Restrict Test. 13.)

The Court agrees that Dr. Hellman's opinion regarding the causal link between Decedent's death and the 2013 accident is not reliable. In order for an expert's opinion to be considered reliable, the opinion must be the product of "reliable principles and methods." *Schneider*, 350 F.3d at 404. Although Dr. Hellman testified that he agrees with Dr. Freese's causation opinion, Dr. Hellman has not demonstrated that his conclusion as to the relationship between the 2013 accident and Decedent's death is the result of Dr. Hellman's independent analysis. Dr. Hellman admits that it was not part of his inquiry to evaluate or investigate the relationship between Decedent's death and the 2013 accident. (Hellman Dep. 65:23–66:7.) In fact, Dr. Hellman's report does not make any mention of Decedent's 2013 accident. While Dr. Hellman concludes that Decedent's death was caused by a mixture of prescription medication which Decedent was taking to treat his neck and back pain, Dr. Hellman admitted that he did not

know whether Decedent had been taking pain medication for his neck and back prior to the 2013 accident. (Hellman Dep. at 38:3–17.) Further, it is not clear what, if any, information Dr. Hellman relied on in forming his opinion because Dr. Hellman's testimony regarding the documents he reviewed in performing the autopsy is extremely confusing. Dr. Hellman testified:

> A. Well, since I don't have the medical records, it's not in other part of my file, my interpretation would be that came from medical records.
>
> Q. That you reviewed?
>
> A. Yes, sir, but I don't have independent recollection of reviewing those records and we couldn't find them in my office.

(Hellman Dep. 64: 16–23, ECF No. 78-17.) On one hand, Dr. Hellman states that the information included in his Postmortem Report came from medical records. On the other hand, Dr. Hellman has no recollection of reviewing those records. Without knowing what information Dr. Hellman reviewed in forming his opinion, the Court cannot conclude that Dr. Hellman's opinion is reliable. Therefore, Dr. Hellman is not permitted to offer his opinion regarding the relationship between Decedent's death and the 2013 accident. However, as Defendant concedes, Dr. Hellman is permitted to testify about the observations he made while performing the autopsy. Thus, while Dr. Hellman is not permitted to offer an opinion regarding the relationship between the 2013 accident and Decedent's death, Dr. Hellman may testify about how Decedent's neck surgeries and infection contributed to Decedent's death as this opinion falls within the scope of Dr. Hellman's Postmortem Report.

### 3. Dr. Manion's Causation Opinion will not be Excluded.

Defendant argues that portions of Dr. Manion's causation opinions should be excluded because said portions are not the result of Dr. Manion's independent analysis. Dr. Manion's causation opinion has three components: (1) Decedent's death was accidental and not the result

9

of a suicide; (2) Decedent died of mixed prescription drug intoxication, however, no single drug alone caused Decedent's death; and (3) Decedent's 2013 accident "led to medical problems that led to surgery that ultimately led to his death." (Manion Report 6.) Defendant has no objection to Dr. Manion's first and second opinions. However, Defendant maintains that Dr. Manion's opinion as to the causal link between the 2013 accident and Decedent's death should be excluded because this opinion is simply a "repetition and digest" of Dr. Hellman's deposition testimony. (Def.'s Mot. Restrict Test. 16.) The Court disagrees.

Dr. Manion's causation opinion will not be excluded. The central question when deciding the admissibility of expert opinions is whether the opinions are the product of reliable principles and methods. Put differently, the Court must determine whether Dr. Manion has good grounds for his conclusions. *Mitchell*, 365 F.3d at 244. As discussed above, the differential diagnosis has been recognized as a reliable basis for causation opinions. *Heller*, 167 F.3d at 156; *Terry*, 2016 U.S. Dist. LEXIS 98862 at *9. In using the differential diagnosis, an expert may perform physical examinations, obtain medical histories, and review the patient's clinical tests in order to render an opinion as to the cause of the patient's death. *Kannankeril*, 128 F.3d at 807. However, "[a] doctor does not have to employ all of these techniques in order for the doctor's diagnosis to be reliable." *Id.* A differential diagnosis may be reliable with less than all of these categories of information. *Id.* Although Dr. Manion did not examine Decedent personally, he reviewed the physical examination results provided by Dr. Freese and the Postmortem Report created by Dr. Hellman. The Third Circuit has explained that:

> Depending on the medical condition at issue and on the clinical information already available, a physician may reach a reliable differential diagnosis without himself performing a physical examination, particularly if there are other examination results available. In fact, it is perfectly acceptable, in arriving at a

> diagnosis, for a physician to rely on examinations and tests performed by other medical practitioners.

*Kannankeril*, 128 F.3d at 807.

Dr. Manion's methodology, as reflected in his report, is consistent with differential diagnosis. Before concluding that Decedent's death was caused by Decedent's 2013 accident, Dr. Manion reviewed the following documents: (1) Plaintiff's claim for damages; (2) Decedent's medical records, including those provided by Dr. Freese; (3) Decedent's death certificate, autopsy report, and toxicology report; (4) Plaintiff's First Amended Complaint; (5) Dr. Freese's February 20, 2016, letter to Plaintiff's attorney; (6) color photographs of Decedent's neck infection; and (7) Dr. Hellman's deposition. (Manion Report 5, ECF No. 78-6.) After reviewing the aforementioned documents Dr. Manion concluded that Decedent "was not deliberately abusing his medication in order to get high." (Manion Report 1.) According to Dr. Manion, the high level of medication found in Decedent indicates that Decedent "was having genuine muscle spasm symptomatology" and sought to treat it with medication. (Manion Report 1.) Dr. Manion concluded that Decedent would not have needed to medicate so heavily had he not suffered the injuries caused by the 2013 accident. The Court finds that Dr. Manion has provided a sufficient basis for his opinion.

While Defendant appears to be satisfied with Dr. Manion's basis for Dr. Manion's first two conclusions—that Decedent's death was not a suicide and that Decedent's death was not caused by one drug in particular—Defendant maintains that Dr. Manion's "deposition testimony reveal[s] that he has virtually no basis for [his third conclusion], other than mimicking Dr. Freese's report." (Def.'s Mot. Restrict Test. 17.) Defendant is not entitled to exclusion of Plaintiff's expert testimony simply because the proffered testimony is not favorable to Defendant's position. In addition, the fact that several experts agree with each other and reach

11

the same conclusion does not mean that the experts are parroting each other's opinions. Dr. Manion has provided a sufficient explanation for his causation opinion which is based on his independent analysis of Decedent's medical records.

Rule 702 also requires that the expert's testimony fit the issues in the case. *Scheider*, 350 F.3d at 404. The Court finds that Dr. Manion's testimony is relevant to the issue of proximate cause in this case. As such, Dr. Manion's testimony will help the trier of fact in determining whether there is a causal link between the 2013 accident on Defendant's property and Decedent's death. Therefore, Dr. Manion's causation opinion will not be excluded.

**4. Dr. Ingram's Causation Opinion will not be Excluded.**

Finally, Defendant argues that Dr. Ingram's causation opinion should be excluded because it is beyond the scope of Dr. Ingram's report. Before Decedent's death, Dr. Ingram treated Decedent for injuries he sustained during the 2013 accident. Dr. Ingram has concluded that Decedent's death was caused by the 2013 accident. Defendant maintains that this opinion should not be admitted because Dr. Ingram's report does not state why Dr. Freese operated on Decedent, nor does the report explain how the operation proximately caused Decedent's death or why the accident necessitated the numerous medications Decedent was taking prior to his death. Thus, according to Defendant, Dr. Ingram offers "no reliable methodology or basis for concluding that Decedent's death from mixed prescription drug intoxication resulted from his 2013 fall." (Def.'s Mot. Restrict Test. 19.)

Dr. Ingram's causation opinion will not be excluded because the Court finds that Dr. Ingram has provided a sufficient basis for his opinion. To be reliable, an expert's opinion must be based on good grounds. *Scheider*, 350 F.3d at 404. As Decedent's primary treating physician, Dr. Ingram was in the best position to determine what effect the 2013 accident had on

Decedent's health. Dr. Ingram saw Decedent "every two weeks for a very long time." (Ingram Dep. 38:7–8.) Dr. Ingram treated Decedent just five (5) days following the accident and assisted in diagnosing Decedent. (Ingram Dep. 38:8–9.) Dr. Ingram conducted a physical examination of Decedent and observed that Decedent suffered from significant spasms and dysfunction in his spine. (Ingram Report 2, ECF No. 78–7.) In addition, Dr. Ingram reviewed Decedent's medical history, including X-ray and MRI results. As part of his treatment of Decedent's injuries, Dr. Ingram prescribed Lodine, Soma (carisoprodol), and hydrocodone.[2] (Ingram Report 2.) Dr. Ingram later referred Decedent to Dr. Freese because Decedent's pain persisted. (Ingram Report 4.) Dr. Freese eventually performed two surgeries on Decedent in an effort to alleviate Decedent's pain. (Ingram Report 4.) Dr. Ingram was present for each of these operations. (Ingram Dep. 38:9-15.)

Dr. Ingram concludes his report by stating that "[a]ll of the above diagnoses came about as a direct result of the work-related accident which occurred on 4/17/2013." (Ingram Report 5.) During Dr. Ingram's deposition Defense counsel questioned Dr. Ingram extensively regarding the basis and meaning of this statement. Dr. Ingram explained that "the fall into the ten or 12-foot hole that occurred at work led to the diagnoses that I listed on page 4." (Ingram Dep. 34:1–3.) Defense counsel then suggested that nothing in Dr. Ingram's report supported Dr. Ingram's causation opinion. Dr. Ingram then explained that:

> [T]his report is outlining a story of what happened to a patient who was injured, who sustained significant traumatic injuries, one which ultimately required surgery and medication, both of which led to his death . . . . The information that I referenced to support that would be the autopsy report showing the history of the meningitis and the cause of death being the mixed prescription

---

[2] Both Soma and hydrocodone were found in Decedent's system at the time of his death. *See* Postmortem Report 10.

> drug intoxication. In my opinion, those things are related to the patient's traumatic injuries and need for surgery.

(Ingram Dep. 35:16–36:6.) Thus, Dr. Ingram clearly articulated good grounds for his conclusion as to the cause of Decedent's death. In sum, Dr. Ingram's personal examination and treatment of Decedent along with Dr. Ingram's review of Decedent's medical record, including the Postmortem Report, led to Dr. Ingram's conclusion. As discussed above, these are the types of documents and observations medical doctors rely on in reaching a conclusion regarding cause of death. Thus, the Court finds that Dr. Ingram's opinion is reliable.

Rule 702 also requires that the expert's testimony fit the issues in the case. *Scheider*, 350 F.3d at 404. The Court finds Dr. Ingram's testimony is relevant to the issue of proximate cause in this case. Dr. Ingram's testimony will help the trier of fact in determining whether the 2013 accident was the proximate cause of Decedent's death. Because the Court finds that Dr. Ingram's opinion is reliable and fits the issues in this case, Dr. Ingram's testimony will not be excluded.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion in Limine to Restrict Testimony of Drs. Freese, Hellman, Manion, and Ingram is GRANTED IN PART AND DENIED IN PART.

An appropriate order follows.